## BOURBONNAISE v. STATE.

Nos. A-11621, A-11633. Sept. 17, 1952.

(248 P. 2d 640.)

Lloyd Anthony Bourbonnaise, pro se.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and L. J. Bicking, County Atty. Tulsa County, Tulsa, for defendant in error.

PER CURIAM. On May 28, 1952, an opinion was rendered in the above case dismissing the appeal, for the reason that it was not timely filed. This court has always assumed a liberal attitude toward the right of an accused to have his appeal determined on its merits, and where by any reasonable possible construction of the steps taken to perfect the appeal jurisdiction may be obtained of the purported appeal, we have made such construction for the purpose of disposition of the appeal on its merits.

Therefore, we are treating the first instrument filed by the accused as the docketing of his appeal, even though the style of the pleading was misnamed by the accused. He was without counsel and we feel under the circumstances that the court is justified in treating the appeal as having been perfected on the date such instrument was filed, which was within the six months period authorized by law in which an appeal could be taken. Accordingly, the opinion dismissing the appeal has been recalled, and we now consider the various questions presented by the appeal on their merits.

The defendant was charged in the district court of Tulsa county with petit larceny by fraud, second and subsequent offense, was tried before a jury, found guilty and assessed punishment at three years in the State Penitentiary.

Defendant was represented by an attorney at preliminary hearing, but at trial stated that he would represent himself, and did, but an attorney, without charge, prepared for defendant a motion for new trial, which was overruled. The state paid for the record for appeal.

For reversal it is the contention of defendant that the evidence on the part of the state failed to show that he was guilty of the crime charged of "Petit Larceny by Fraud, Second and Subsequent Offense." It is stated by defendant that the charge should have read: "Obtaining money by false pretenses." In support of his position, defendant cites the recent case of Warren v. State, 93 Okla. Cr. 166, 226 P. 2d 320.

It is necessary to clearly consider the evidence developed by the state. Defendant did not testify, and offered no evidence.

Emmett Bean testified that he worked in the engineering section of the Service Pipe Line Company. That on November 15, 1950, he was working in room 127, first floor, along with Loren Lewis and W. C. Clark; and that the defendant, Lloyd Anthony Bourbonnaise, came in and asked to use the telephone. Defendant called several officials of the Company, but could not get them, and witness offered to help him. Defendant stated that was just a bootlegger and had sold them some whiskey, and that he wanted to get a Christmas order. Witness became interested and got the price quotations from defendant. The next day defendant returned and witness stated that they had decided they wanted some liquor. Said witness: "We told him we wanted fifths and he said, 'Well, I don't have anything but pints, how about pints?' We told him, 'Well, we don't believe we cared for pints, but we would like to have some fifths.' He said, 'I have got to run upstairs, see some of the fellows, I will be back in a few minutes, talk to you, and see if I can't rig up something'; so he went upstairs and he stayed, oh, around, I will say thirty or forty-five minutes, and he came back downstairs and he had a handful of money, said he had collected upstairs and he told us, "Fellows, I will tell you what I will do, I have got another little deal where I can run out here and get your fifths, get them back to you in about thirty minutes, it is from another bootlegger, I will have to have some money first.' So we didn't have much doubt, when he came back from upstairs with that money, then he called the officials upstairs by their first names, see, and we didn't have much doubt, naturally, we would not call them—the president of the Company, Mr. Moore, see, anyway, he took our money, thirty minutes passed, two hours passed, he still didn't show up. Some two weeks later I found him down town and had him arrested and that is the extent of the story."

Loren L. Lewis testified substantially as his coworker, Bean. Witness stated that the first time defendant used their 'phone that he "wanted to know if we knew anybody he could sell a lug to, and he had half a case he wanted to get rid of that evening. We don't know anybody so he left out." Witness stated that defendant left a price list, and that the next day defendant came back and did some more telephoning. Defendant wanted to know if Bean and Lewis wanted any whiskey then. They had decided to take a lug of fifths, that he would have to get fifths locally, he would have to try to get them from some other source. Witness further stated:

"A. He could not get these fifths, he could get maybe two fifths and two pints, but we told him we wanted fifths. He said it would take quite a while. He told him [Bean] all his story, and then Mr. Bean brought him back to the back and he told it again to me. I had him go over it a couple of times, I wanted the straight of it, but anyway, to be able to get the fifths, he would have to go across town or something or take quite a trip to get them and he could get the fifths locally here from some other source, that he had enough money—he had a little money, if he had enough money to cover the rest of it, he could get the other fifths handy and it would not take him over a half hour anyway, and he wanted eight dollars more to cover that because he could not get a check cashed, no one knew him, being an out-of-towner, and he needed more money; so he got the money off us, part of it, and went off and never came back."

M. M. Leavell, police officer of Tulsa, testified that he was acquainted with Lloyd Anthony Bourbonnaise, the defendant, and after the within charge was filed that he talked with defendant at the jail and informed him that they were filing a second offense case against him, and that he said he thought that was a little rough for the little amount of money that he had gotten; that he thought these fellows that had given him the money had just as much larceny in their hearts as he did.

The state next offered in evidence judgment and sentence in case No. 2447, from the district court of McClain county, showing defendant's conviction of

burglary in the second degree, subsequent offense, and showing delivery of defendant to the warden of the State Penitentiary. The defendant stated that his attorney at the preliminary had agreed to the admission without his consent, and he thought the "clerk and those people should have been here to testify." Defendant raised no formal objection, however, and stated, "I am going to submit to this."

From the record it is apparent that the sole question is whether the evidence supports the charge set out in the information.

Analyzing the evidence, it seems clear that the first day defendant talked to the prosecuting witness, Bean, he convinced him and his co-worker Lewis, that he then had some lugs of whiskey and was making sales, but the officials he telephoned were out. He asked if they or anyone there wanted a lug at that time. They did not, but the next day Bean and Lewis decided they wanted a fifth each. but defendant did not have anything but pints, but did agree to get a lug of fifths from a local bootlegger for them. Bean gave him $4 to go purchase him a fifth of Belmont.

Witness Lewis on cross-examination by Borbonnaise had said that other bootleggers had delivered him fifths of Belmont whiskey there at the office at prices varying from as low as $3.65 to $3.85 to $4.11 to $4.75. So, apparently the witness did not think the price quoted such a bargain as to cast suspicion on the deal. Though defendant indicated to an officer that he thought witnesses had as much larceny in their hearts as he did.

Bourbonnaise was to return within thirty minutes with the whiskey he had agreed to purchase.

From the facts stated, it is clear that the defendant was to act as agent of Bean, who entrusted the defendant with the $4 for the specific purpose of purchasing the whiskey for him.

The price of $4 had been quoted by defendant. This money was not given the defendant to consummate a purchase of liquor represented by defendant to be in his possession, as he attempted the first day he visited them. If such had been the case, then the money would have become defendant's money, and if the defendant had failed to turn over the liquor, then supposed to be in his possession either on his person or somewhere outside, such facts would have supported a charge of obtaining money under false pretenses. But here defendant did not represent that he had any fifths, but merely agreed to take Bean's money and go purchase the liquor from another bootlegger. The money was not his. He was to pay it over for Bean. It was Bean's money until paid over, and then the whiskey would be Bean's.

As we have pointed out in other cases, the distinction between "larceny" and "false pretenses" is a very narrow margin. The character of the crime depends on the intention of the parties. If the owner parts with the "possession" and "title" of the property "voluntarily, it is not larceny. If the owner is induced to part with possession by fraud and misrepresentation and the title to the property does not pass, and there is a fraudulent intent at the time to appropriate the property to one's own use and deprive the owner thereof, it is larceny. Hagan v. State, 76 Okla. Cr. 127, 134 P. 2d 1042; Dobson v. State, 74 Okla. Cr. 341, 126 P. 2d 95; Abbott v. State, 78 Okla. Cr. 407, 149 P. 2d 514.

A study of the cited late case of Warren v. State, 93 Okla. Cr. 166, 226 P. 2d 320, will disclose that it does not support the theory of the defendant as it would have if the victim had decided to purchase from the lugs of whiskey that defendant was supposed to have in his possession there the first day, and

where the title to the money would have passed to defendant, whther he handed over the liquor immediately or whether the victims trusted him to go outside and return with the liquor.

In the case cited by defendant, Warren v. State, supra, it is true Warren outlined a plan whereby he was to purchase automobiles with the cashier's checks furnished by one Eller made payable to Warren, but these automobiles were not for the victim Eller, but for supposed customers of Warren, who would pay Warren and then Warren was to return Eller's money plus $200 profit on each car sold. Warren gave Eller a note and mortgage in blank covering the amount of money advanced. It is true Warren also agreed to later on purchase cars for Eller, but that was just another phony inducement. In the particular transaction where charged he was purchasing the automobiles for his own customers presumably, so that the money advanced was in the nature of a loan—fraudulently obtained. A careful reading of the Warren case will disclose the distinction between it and the within case. No useful purpose will be served by lengthy quotations.

Finding no error, the judgment of the district court of Tulsa county is affirmed.